NOT FOR PUBLICATION                          [Dkt. No. 36]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

STEPHEN KLEMASH,

        Plaintiff,

   v.

MONROE TOWNSHIP, et al.,

        Defendants.

Civil No. 07-4190 (RMB)

**OPINION**

Appearances:

     Gregg L. Zeff
     Frost& Zeff, Esqs.
     430 Route 70 West
     Cherry Hill, NJ 08002
        Attorney for Plaintiff

     Robert A. Baxter
     Kelley, Wardell, Craig, Annin & Baxter, LLC
     41 Grove Street
     Haddonfield, NJ 08033
        Attorney for Defendants Monroe Township and
        Greg Wolfe

**BUMB**, United States District Judge:

## I.  Introduction

On September 29, 2006, Defendant Detective Gregory Wolfe of

Monroe Township, New Jersey, arrested Plaintiff Stephen Klemash

for disorderly conduct.  Despite Plaintiff's alleged plea that he

not be handcuffed from behind his back due to a prior shoulder

surgery, Detective Wolfe did handcuff Plaintiff behind the back,

1

which Plaintiff alleges caused him serious, permanent injuries.

On September 10, 2007, Plaintiff filed a Second Amended Complaint alleging various constitutional violations against Detective Wolfe and Monroe Township, including excessive force, failure to train, as well as claims for assault and battery, false arrest[1], false imprisonment, violations of New Jersey's Civil Rights Act and negligence.  Defendants now move for summary judgment as to all claims [Docket No. 36].  For the following reasons, Defendants' motion is denied.

## II.  Background[2]

---

[1]    Plaintiff withdrew his false arrest and false imprisonment claims in his brief filed in opposition to Defendants' Motion for Summary Judgment.  See Pl.'s Opp. Br. at 2.

[2]    The Court notes that Plaintiff failed to submit a response to Defendants' Statement of Material Facts with his opposition papers as required by Local Rule 56.1.  See L. Civ. R. 56.1 ("The opponent of summary judgment shall furnish, with its opposition papers, a responsive statement of material facts, addressing each paragraph of the movant's statement, indicating agreement or disagreement and, if not agreed, stating each material fact in dispute and citing to the affidavits and other documents submitted in connection with the motion").  Even so, the Court will consider the factual statements asserted in Plaintiff's brief, as supported by counsel's declaration and attached exhibits, to determine whether a genuine issue of material fact exists.  See Shirden v. Cordero, 509 F.Supp.2d 461, 464 n.1 (D.N.J. 2007) ("lack of compliance with the Local Civil Rules has made it difficult and time-consuming for the Court to determine whether a genuine issue of material fact exists . . . [n]onetheless, the Court, having found no evidence of bad faith, will decide Defendants' motion on its merits, relying on the facts put forth in the Final Pretrial Order . . . , the Plaintiff's answers to interrogatories[,] and the additional facts cited in the parties' respective briefs").

On September 29, 2006, Plaintiff and his girlfriend, Judith Newport, set out for Owens Park to watch Plaintiff's nephews play football.  Pl.'s Opp. Br. at 2-3; Defendants Statement of Material Facts ("Def. SOF") at ¶ 1.  Plaintiff's aunt, Jean Klemash, and uncle, Michael Klemash, drove to the park separately.  Pl.'s Opp. Br. at 3.  Plaintiff's girlfriend drove Plaintiff in her vehicle because Plaintiff did not have a driver's license.  <u>Id.</u>

Ms. Newport parked her car off a side road located within the park between other cars.  Pl.'s Opp. Br. at 3-4; Def. SOF ¶ 5.  After parking, Plaintiff and Newport walked to the field to watch the football game.  Pl.'s Opp. Br. at 4.  Approximately ten minutes later, Plaintiff located his uncle, who asked Plaintiff for drinks that Plaintiff was supposed to bring to the game.  <u>Id.</u> Plaintiff and his uncle went back to Newport's vehicle to retrieve the drinks and smoke a cigarette.  <u>Id.</u>  Plaintiff's uncle took the drinks and returned to the field while Plaintiff remained by the vehicle to finish his cigarette.  <u>Id.</u>  At this time, Plaintiff noticed a woman, later identified as Mary Brown, walking around the area where Newport's vehicle was parked.  <u>Id.</u>

_____

3

**A.   Plaintiff's Confrontation with the Parking Attendant**

Mary Brown, a part-time employee for Monroe Township who worked as a park attendant and whose duties included enforcing parking rules, approached Plaintiff and told him to move his car. Pl.'s Opp. Br. at 4; Def. SOF ¶¶ 2, 24.  When Plaintiff refused, Ms. Brown informed Plaintiff she was issuing him a parking citation and began to write something on a napkin.  Pl's. Opp. Br. at 4; Def. SOF ¶ 27.  In response, Plaintiff told Ms. Brown to leave him alone or he would call the police.  Pl.'s Opp. Br. at 4.  Ms. Brown informed Plaintiff that she was with the Parking Authority and told him that his vehicle would be towed.  Id. Plaintiff admits he raised his voice at Brown.  Id.

**B.   Plaintiff's Confrontation with Detective Wolfe**

Detective Gregory Wolfe observed Plaintiff and Ms. Brown arguing from approximately 150 feet away.  Def. SOF ¶ 29. Detective Wolfe approached Brown and Plaintiff and asked if there was a problem.  Pl's Opp. Br. at 5; Def. SOF ¶ 30.  Ms. Brown informed Detective Wolfe that Plaintiff was refusing to move his car.  Def. SOF ¶ 31.  Plaintiff told Detective Wolfe that Ms. Brown showed him no identification.  Pl.'s Opp. Br. at 5. Detective Wolfe identified himself as a police officer.  Def. SOF ¶ 32.  Plaintiff alleges that Detective Brown then pulled up his shirt, revealing a gun, and asked, "Is this ID enough for you?" Pl.'s Br. at 5.

4

When Detective Wolfe asked Plaintiff for his license and registration, Plaintiff responded that he did not have them.  Id. When Detective Wolfe repeatedly requested the documents, Plaintiff raised his voice.  Id.  As the situation escalated, Plaintiff used the word "bullshit."  Id.; Def. SOF ¶ 33.  At this point, Plaintiff was placed under arrest for disorderly conduct. Pl.'s Opp. Br. at 5; Def. SOF ¶ 34.  Detective Wolfe testified that Plaintiff used an obscenity only once and that he would not have arrested Plaintiff if he had not used this obscenity.  Pl.'s Ex. C, Wolfe Dep. 65:1-13, Oct. 6, 2008.

Detective Wolfe walked Plaintiff to his unmarked car without further incident.  Pl.'s Opp. Br. at 5; Def. SOF ¶ 34-35.  When they arrived at the car, Wolfe asked Plaintiff to place his hands on the vehicle.  Pl.'s Opp. Br. at 6.  Detective Wolfe then reached into his vehicle and retrieved his handcuffs.  Id.; Def. SOF ¶ 36.

### C.  Detective Wolfe's Use of Force

The parties do not dispute that when Detective Wolfe attempted to handcuff Plaintiff, a physical struggle ensued. Def. SOF 37.  Defendants acknowledge that "the participants have different recollections of what exactly transpired next."  Def. SOF ¶ 38.

### 1.   Plaintiff's Version of Events

Plaintiff's version of the events is the following.  Upon seeing the handcuffs, Plaintiff told Detective Wolfe, "Officer before you cuff me . . . I have to let you know I just went through therapy and surgery . . . I'm unable to put my hands behind my back."  Pl.'s Ex. A, Klemash Dep. 93:4-7, Mar. 28, 2008.  Plaintiff pleaded, "Please don't do this.  I'm not lying. I can show you I still have a scar.  You can call Kennedy which is right around the corner and ask them.  Dr. Ponzio is my . . . ."  Id. at 95:20-24.  Plaintiff curled his right hand and arm into his chest.  Pl.'s Opp. Br. at 6.  Detective Wolfe ripped Plaintiff's arm behind his back and smashed Plaintiff's head into the vehicle.  Id.  Detective Wolfe then threw Plaintiff to the ground.  Id.  Plaintiff landed on his right arm.  Id.

A crowd developed at the scene, and a man who weighed approximately 260 pounds placed his knee or foot on Plaintiff's back while Detective Wolfe pulled Plaintiff's right arm behind his back to handcuff him.  Id.  Plaintiff then partially blacked out and began hyperventilating from the pain in his arm.  Id.

At this point, Plaintiff's girlfriend arrived at the scene and told Detective Wolfe, "[Plaintiff's] arm is fused.  He had surgery.  You can take him, but can you unhandcuff him and cuff him from the front?"  Pl.'s Ex. G, Newport Dep. 86:4-7, Oct. 16, 2008.  She then watched as Plaintiff was picked up by the

6

handcuffs and pulled to his feet.  Id. at 92:14-22.  See also
Pl.'s Ex. D, Brown Dep. 58:7-10,Oct. 6, 2008 ("I can't say for
sure, but I think [Plaintiff was pulled up] around the wrist
area.").  Ms. Newport could not recall if Detective Wolfe or the
gentleman assisting Wolfe caused Plaintiff to be picked up in
this manner.  Pl.'s Ex. G, Newport Dep. at 92:24-93:3.  Plaintiff
was in tears when he was placed in a marked vehicle that had
arrived at the scene and requested a doctor.  Pl.'s Ex. A,
Klemash Dep. at 102:2-9.

### 2.  Defendants' Version of Events

Defendants' version of the events differs from Plaintiff's.
As Detective Wolfe attempted to handcuff Plaintiff on his left
arm, Plaintiff pushed off Wolfe's vehicle and moved his arms away
from Wolfe.  Def. SOF ¶ 38.  Detective Wolfe reminded Plaintiff
that he was under arrest.  Id.  The two struggled and fell to the
ground.  Id.  Plaintiff landed on his stomach and Detective Wolfe
managed to handcuff Plaintiff's left arm.  Id.  Plaintiff kept
his right arm underneath his stomach and cursed at Detective
Wolfe that he would not be handcuffed.  Id.  Wolfe instructed
Plaintiff to give up his right arm and attempted to pull
Plaintiff's right arm out from underneath him.  Id. at ¶ 39.
Detective Wolfe did not recall anyone telling him that Plaintiff
had an injury to his arm or shoulder.  Pl.'s Ex. C, Wolfe Dep.
90:20-22.

Lawrence Johnson, a corrections officer, observed the
struggle and assisted Wolfe by pulling out Plaintiff's arm.  Def.
SOF ¶ 40, 44.  Johnson recalled a woman hollering to let
Plaintiff go and that Plaintiff said he would sue.  Id. at 45.
Plaintiff was transported to the Monroe Township Police
Department by a uniformed officer.  Def. SOF ¶ 51.

### D.  Plaintiff's Medical Condition

When he arrived at the police station, Plaintiff complained
of problems in his right shoulder and insisted on medical
treatment.  Pl.'s Opp. Br. at 7; Def. SOF ¶ 51.  Plaintiff
alleges that he was told that if he signed a medical release
form, he could transport himself to the hospital.  Pl.'s Opp. Br.
at 7.  Plaintiff was ultimately released without posting bail and
an ambulance transported him to Kennedy Hospital.  Pl.'s Opp. Br.
at 7; Def. SOF ¶ 51.  Plaintiff was thereafter examined by Dr. A.
Lee Osterman, who diagnosed Plaintiff with chronic pain syndrome
and declared him permanently disabled.  See Pl.'s Ex. N, Report
of Dr. Osterman at 6.

### E.  Monroe Township Standard Operating Procedures for Use of Handcuffs

Monroe Township Standard Operating Procedure (hereafter
"SOP") 38:3.1 directs that "any prisoner to be transported will
be handcuffed."  See Pl.'s Ex. J; Def. SOF ¶ 54.  SOP 38:3.1
further directs that "[i]n addition to handcuffing, officers will

secure the prisoner in the patrol vehicle using the available
seatbelt devices, with the hands of the prisoner <u>located behind
the back</u>." <u>Id.</u>" (emphasis added). Importantly, however, SOP
38:3.1 also contains the following exception:

> EXCEPTION: Officers may elect not to handcuff a prisoner in
> cases such as arrest for FTA Warrants for non criminal
> matters/traffic violations and for non violent offenses
> under state statutes and local ordinance. Officers will use
> their discretion keeping in mind the safety of themselves,
> the prisoner, the public, and any other circumstances
> present at the time.

<u>Id.</u> SOP 38:2.4 directs that, "[r]estraining devices are to be
utilized when transporting handicapped prisoners. Officers may,
however, elect not to use such devices depending on the extent of
the handicap while at the same time keeping in mind safety and
security of the prisoner and others." <u>See</u> Pl.'s Ex. J. SOP
38:2.5 directs that "[r]estraining devices are to be utilized
when transporting sick and injured prisoners except when they
interfere with the application of medical assistance." <u>Id.</u>

Monroe Township Department Training Officer John Cortesi
testified that the Department did not train officers in the use
of handcuffs because handcuffing was taught in the police
academy. Pl.'s Ex. E, Cortesi Dep. 7:14-29; 33:14-21, Jan. 14,
2009. The Department did not train officers in alternatives to
handcuffing someone behind their back if they qualified as a
"handicapped prisoner" as outlined in SOP 38:2.4. <u>Id.</u> at 28:12-
19. Officer Cortesi would advise members of his department to

handcuff someone who claimed he or she could not put his or her arms behind the back in the front, as opposed to behind his or her back.  Id. at 29:11-30:1.  However, Lieutenant Anthony Pace of the Monroe Township Police Department, who was the officer in charge of SOPs at the time Plaintiff was arrested, stated that there was no specific SOP for how to handcuff a person with hand or shoulder injuries.  Pl.'s Ex. H, Pace Dep. 6:22-7:12; 17:3-7; 23:14-25, Oct. 6, 2008.

Police Chief Domenic Christopher did not recall any exceptions to handcuffing someone behind the back, but noted "I'm sure there are, and there's always a different circumstance, however, for the safety of everyone, handcuffing from the back is what you're supposed to do."  Pl.'s Ex. K, Christopher Dep. 24:18-25:2, Dec. 15, 2008.  Detective Wolfe testified that "[w]e handcuff everybody behind their back," although he acknowledged that he did not recall receiving training on how to restrain a person who could not put his or her arm behind the back.  Pl.'s Ex. C, Wolfe Dep. 13:2-8; 96:1-5.  Wolfe further testified that he did not know whether Monroe Township had a policy regarding handcuffing.  Id. at 13:9-12.  Wolfe stated that even if he knew that Plaintiff had a shoulder injury that made it difficult or impossible for him to move his arm behind his back, Wolfe was not sure whether he would have made a different decision about how to handcuff Plaintiff.  Id. at 95:15-22.

Officer Cortesi further testified about the proper way to transport a prisoner, who had been handcuffed behind the back, from a prone position to a standing position:

> There could be a couple ways.  You could have the person either try and get their butt and then you can assist them on either side of them, or you can have them lay flat out and you can have a couple guys on each side of him on their shoulders or arms pick them up depending on the circumstances.
> I mean, you can – you have a guy – you can have a person go to their knees and try to get them up that way.
> There's no specific set standard or getting them off the ground.

Pl.'s Ex. E, Cortesi Dep. 33:25-34:18.  Officer Cortesi testified that he was not aware of any formal training offered by the Department on these techniques.  Id. at 34:19-21.  He did, however, agree that it would be improper to physically lift a person by the handcuffs because of the risk of injury.  Id. at 34:22-35:19.

### 1. Plaintiff's Use of Force Expert

James A. Williams, a consultant in law enforcement policy with thirty years of law enforcement experience, issued an expert report regarding Detective Wolfe's use of force.  Pl.'s Ex. L, Williams Report at 1.  He concluded, "that a well trained and prudent thinking police officer exercising learned procedures for handling disputes, should have and would have known, through appropriate and unbiased inquiry, that the matter between [Plaintiff] and Mary Brown should not [have] escalate[d] to a police action resulting in arrest."  Id. at 9.  Williams further

11

opined that "the action initiated by Detective Wolfe in having a
person, other than a police officer, place his knee in the back
of [Plaintiff] was without cause or necessity." Id. at 10.
Finally, Williams found that "lifting [Plaintiff] from the ground
by lifting upward on his handcuffed wrists was not in compliance
with accepted police procedures which would normally involve
turning the person over and into a sitting position then lifting
by placing the officer's hands under the armpit and shoulder of
the person being lifted to his/her feet."

Id. In summary, Williams concluded

> that both [u]necessary and [e]xcessive [f]orce was used by
> Detective Gregory Wolfe and an unidentified male prior to
> and during the arrest, the handcuffing procedure, the use of
> a person untrained in the appropriate handcuffing techniques
> accepted and mandated by police procedure, and the
> inappropriate, improper, and egregious agitation of a
> previous injury, after being repeatedly informed of the
> existing shoulder injury, by purposely causing extreme pain
> by putting lifting pressure directly to the wrists of
> [Plaintiff].

Id. at 11.

Williams also offered an expert opinion regarding the
training on handcuffing procedures available to Monroe Township
police:

> I further opine that appropriate and standard and on going
> in-house training sessions, involving Handcuffing Techniques
> as a follow up to the academy training received by all
> police officers graduating the basic course, was not
> mandated by the Chief of Police.  This failure to
> objectively train and supervise police officers under the
> command and direct responsibility of the police chief to
> administratively enforce standard operational policy thereby
> added causation of the violation(s) discussed herein.

12

Id.  Williams specifically concluded that there existed "a
serious and inadequate degree of standard care and responsibility
by the Police Chief, the Police Captain and the designated Police
Training Lieutenant."  Id.

### 2.   Defendants' Use of Force Expert

Leo A. Culloo, of Police Management Consultant Services,
Inc., provided an expert report on Detective Wolfe's use of
force.  Def. Ex. Q.  Culloo's report noted that Detective Wolfe
received training on the use of force and handcuffing when he
attended the Camden County Police Academy in 1992.  Id. at 1.
Upon reviewing various witnesses' accounts of the events of
September 29, 2006, Culloo concluded that "[i]t was necessary to
use force against [Plaintiff] when he would not permit Detective
Gregory Wolfe to handcuff him and to continue to use force on
him, with the assistance of a bystander Corrections Officer,
until both of his wrists were handcuffed."  Id. at 26.  Culloo
noted that "[t]here is conflicting testimony between Detective
Gregory Wolfe and [Plaintiff] and his girlfriend as to how
[Plaintiff] was lifted off the ground when he was lying face
down."  Id.  Culloo concluded that "[w]hat occurred in this
incident is the sole responsibility of [Plaintiff] as evidenced
by his actions and his failure to exercise self-control and
evidencing a total lack of respect for authority."  Id.

## III. Standard

Summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). The record is construed in the light most favorable to the non-moving party, and that party is granted all reasonable inferences therein. <u>Anderson v. Conrail</u>, 297 F.3d 242, 247 (3d Cir. 2002). The ultimate question is "whether a jury could reasonably find either that the plaintiff proved his case by the quality and quantity of the evidence required by the governing law or that he did not." <u>Anderson</u>, 477 U.S. at 254.

Summary judgment against a party who bears the burden of proof at trial, as Plaintiff does here, is proper if after adequate time for discovery and upon motion, a party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). Under such circumstances, "there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts

14

immaterial." <u>Id.</u> at 323 (internal quotations omitted). Further, "the moving party is entitled to a judgment as a matter of law because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." <u>Id.</u>

## IV. Analysis

As noted, Plaintiff's Second Amended Complaint alleges various claims against Detective Wolfe and Monroe Township, including excessive force, failure to train, assault and battery, violations of New Jersey's Civil Rights Act and negligence.

### A. Excessive Force

Count I of Plaintiff's Second Amended Complaint alleges that Detective Wolfe used excessive force against Plaintiff. Defendants maintain that Detective Wolfe is entitled to qualified immunity because his use of force was reasonable under the circumstances.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" <u>Pearson v. Callahan</u>, 129 S.Ct. 808, 815 (2009) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)). The doctrine serves two, important interests: "the need to hold public officials accountable when they exercise power irresponsibly and

the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  Id.

"The primary step in assessing the constitutionality of the officers' alleged actions is to determine the relevant facts." Giles v. Kearney, 571 F.3d 318, 326 (3d Cir. 2009)(citing Scott v. Harris, 550 U.S. 372, 378 (2007)).  "The District Court [is] required to view the facts in the light most favorable to the plaintiff."  Id. (citing Saucier v. Katz, 533 U.S. 194, 201 (2001); Scott, 550 U.S. at 378).  Said differently, "the court must determine if the facts alleged, taken in the light most favorable to the injured party, show a constitutional violation." Halpin v. City of Camden, 310 Fed.Appx. 532, 533 (2009) (citing Saucier, 533 U.S. at 201).

If the Court answers this question in the affirmative, the Court next asks whether the officer made a reasonable mistake of law or fact.  Id.  "The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" Pearson, 129 S.Ct. at 815 (quoting Groh v. Ramirez, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting)(citing Butz v. Economou, 438 U.S. 478, 507 (1978) ("noting that qualified immunity covers 'mere mistakes in judgment, whether the mistake is one of fact or one of law'")). "If the constitutional right in question was clearly established

16

at the time of the violation, such that an objectively reasonable officer could not be mistaken that his conduct violated that right, then there is no mistake of law." <u>Halpin</u>, 310 Fed.Appx. at 533 (citing <u>Butz</u>, 438 U.S. at 507).

The Court considers first whether Detective Wolfe's use of force when handcuffing Plaintiff violated rights guaranteed Plaintiff by the Fourth Amendment. <u>See</u> <u>Graham v. Connor</u>, 490 U.S. 386, 388 (1989). To answer this question, the Court must determine whether Detective Wolfe's actions were "'objectively reasonable' in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation." <u>Id.</u> at 397 (citing <u>Scott v. United States</u>, 436 U.S. 128, 137-39 (1978); <u>Terry v. Ohio</u>, 392 U.S. 1, 21 (1968)). Factors to be considered include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." <u>Id.</u> at 396 (citing <u>Tennessee v. Garner</u>, 471 U.S. 1, 8-9 (1985)). "Additional factors include 'the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time.'" <u>Rivas v. City of Passaic</u>, 365 F.3d

181, 198 (3d Cir. 2004) (quoting <u>Sharrar v. Felsing</u>, 128 F.3d 810, 822 (3d Cir. 1997)).

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," <u>Graham</u>, 490 U.S. at 396, and usually presents a question for a jury.  <u>Rivas</u>, 365 F.3d at 198 (citing <u>Abraham v. Raso</u>, 183 F.3d 279, 290 (3d Cir. 1999)).

Applying this analysis, the Court concludes that the facts, as alleged by Plaintiff, demonstrate that excessive force was used against Plaintiff in violation of his Fourth Amendment rights.  The crime at issue, a disorderly person violation, predicated on the use of a curse word, was certainly not "severe."  Although it appears a crowd was developing around Plaintiff and Detective Wolfe, nothing in the record suggests any reason to believe that Plaintiff posed an immediate threat to the safety of Detective Wolfe or others.  Plaintiff repeatedly told Detective Wolfe that Plaintiff could not place his arm behind his back due to a shoulder injury.  Thus, because this Court must give all reasonable inferences to Plaintiff's version of the facts, Plaintiff was not resisting arrest but merely requesting that he not be handcuffed from the back because of his prior surgery.  A witness at the scene also advised Detective Wolfe that Plaintiff had a medical condition which limited the movement

18

of his right shoulder.  Given Plaintiff's testimony, in addition
to the testimony of Plaintiff's girlfriend, summary judgment
cannot be granted on the ground that Detective Wolfe's use of
force was objectively reasonable under the circumstances he
confronted.

To determine whether Plaintiff's right to be free from
excessive force was clearly established, the Court must consider
"whether it would be clear to a reasonable officer that his
conduct was unlawful in the situation he confronted." Saucier,
533 U.S. at 202.  In other words, the Court asks whether
Detective Wolfe "reasonably misapprehend[ed] the law governing
the circumstances [he] confronted." Brosseau v. Haugen, 543 U.S.
194, 198 (2004) (citing Saucier, 533 U.S. at 206).

Detective Wolfe appears to maintain that he was required to
handcuff Plaintiff behind the back, an obvious mistake regarding
Monroe Police SOP, which permits officers discretion when
handcuffing a person charged with a non-violent offense. See SOP
38:3.1.  Nonetheless, given that Plaintiff's evidence indicates
that Detective Wolfe was repeatedly told that Plaintiff was
unable to move his arm behind his back, and given the minor
offense for which Plaintiff was being arrested, the Court cannot

19

conclude that it would be unclear to a reasonable officer that his conduct was unlawful under the circumstances presented here.[3]

**B.   Section 1983 Municipal Liability**

To state a claim for municipal liability under § 1983, Plaintiff must establish a violation of a constitutional right and that such violation was committed or caused by a "person," here understood to be the municipality, acting under the color of state law.  <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658, 690 (1978).  A municipality "'can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue.'"  <u>Carswell v. Borough of Homestead</u>, 381 F.3d 235, 244 (3d Cir. 2004)(quoting <u>City of Canton v. Harris</u>, 489 U.S. 378, 385 (1989)), <u>cert. denied</u>, 546 U.S. 899 (2005)).  "There must be a 'direct causal link between a municipal policy or custom and the alleged constitutional deprivation' to ground municipal liability."  <u>Jiminez v. All Am. Rathskeller, Inc.</u>, 503 F.3d 247, 249-50 (quoting <u>City of Canton</u>, 489 U.S. at 385).  "Thus, municipal liability attaches only when 'execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury.'"  <u>Bielevicz v. Dubinon</u>,

---

[3]   Qualified immunity may still be available at trial in light of the jury's findings of facts. <u>See</u>, <u>e.g.</u>, <u>Halpin v. Gibson</u>, Civ. No. 05-2088, 2009 WL 3271590, *2-3 (D.N.J. Oct. 9, 2009) (considering a post-trial motion for qualified immunity).

915 F.2d 845, 850 (3d Cir. 1990) (quoting <u>Monell</u>, 436 U.S. at 694).

"Policy is made when a 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict." <u>Id.</u> (quoting <u>Andrews v. City of Philadelphia</u>, 895 F.2d 1469, 1480 (3d Cir. 1990)). A plaintiff can establish a custom "by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." <u>Id.</u> (citing <u>Andrews</u>, 895 F.2d at 1480; <u>Fletcher v. O'Donnell</u>, 867 F.2d 791, 793-94 (3d Cir.) ("Custom may be established by proof of knowledge and acquiescence."), <u>cert. denied</u>, 492 U.S. 919 (1989)). "In either instance, a plaintiff must show that an official who has the power to make policy is responsible for either the affirmative proclamation of a policy or acquiescence in a well-settled custom." <u>Id.</u> (citing <u>Andrews</u>, 895 F.2d at 1480).

In his Opposition Brief, Plaintiff appears to advance three, separate arguments regarding Monroe Township's[4] liability[5]: (1) Monroe Township maintained an unconstitutional

---

[4]   A municipality and its police department are treated as a single entity for purposes of § 1983 liability. <u>Bonenberger v. Plymouth Twp.</u>, 132 F.3d 20, 25 n.4 (3d Cir. 1997).

[5]   The Court notes that Count II if Plaintiff's Complaint states a cause of action against Monroe Township pursuant to § 1983 and Count IV states a claim against Monroe Township for

custom or practice of handcuffing all persons behind the back;
(2) Monroe Township's failure to train officers regarding SOPs
that allowed for exceptions to handcuffing led to Plaintiff's
constitutional injury; and (3) Monroe Township failed to enforce
policies requiring that use of force be reported, which
contributed to the violation of Plaintiff's constitutional
rights.  Defendants maintain that they are entitled to summary
judgment on these claims because Plaintiff cannot demonstrate
that any constitutional deprivation resulted from the Township's
policies.

As to Plaintiff's third argument, Plaintiff concedes in his
brief that it "does not follow directly that the failure to fill
out forms resulted in Plaintiff's injuries."  Pl.'s Opp. Br. at
32.  While Plaintiff may be correct that Detective Wolfe's
failure to complete a use of force form violated Monroe Township
Police Department policy, such violation did not result in
constitutional injury to the Plaintiff.  Nor can the Township be
held vicariously liable for the actions of Detective Wolfe.
Monell, 436 U.S. at 694-95.  Moreover, Plaintiff presents no
evidence to support the contention that Monroe Township had a
policy of not filling out such forms.

---

failure to train, pursuant to § 1983.  As noted, the Court
understood Plaintiff's brief to assert three, separate arguments
for Monroe Township's liability pursuant to § 1983.  If the Court
has misunderstood Plaintiff's position, he should so notify the
Court.

As to Plaintiff's custom and failure to train arguments, Plaintiff "must identify a municipal policy or custom that amounts to deliberate indifference to the rights of people with whom the police come into contact." Carswell, 381 F.3d at 244 (citing City of Canton, 489 U.S. at 388).  "A showing of simple or even heightened negligence will not suffice." Berg v. County of Allegheny, 219 F.3d 261, 276 (3d Cir. 2000) (quoting Board of County Comm'rs of Bryan County, Okl. v. Brown, 520 U.S. 397, 404 (1997)), cert. denied, 531 U.S. 1072 (2001).

Such a claim "typically requires proof of a pattern of underlying constitutional violations" and "proving deliberate indifference in the absence of such a pattern is a difficult task." Carswell, 381 F.3d at 244 (citing Berg, 219 F.3d at 276). It is possible, however, to maintain a failure to train claim without establishing a pattern of constitutional violations:

> In leaving open in [City of Canton, Ohio, 489 U.S. at 390] the possibility that a plaintiff might succeed in carrying a failure-to-train claim without showing a pattern of constitutional violations, we simply hypothesized that, in a narrow range of circumstances, a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations.  The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected "deliberate indifference" to the obvious consequence of the policymakers' choice.

Board of County Comm'rs of Bryan County, Okl., 520 U.S. at 409.

23

"In addition to proving deliberate indifference, a plaintiff must also demonstrate that the inadequate training caused a constitutional violation." Carswell, 381 F.3d at 244 (citing Grazier v. City of Philadelphia, 328 F.3d 120, 124-25 (3d Cir. 2003)). "There must be 'a direct causal link between a municipal policy or custom and the alleged constitutional deprivation.'" Id. at 244-45 (quoting Brown v. Muhlenberg Twp., 269 F.3d 205, 214 (3d Cir. 2001)).

Plaintiff contends that Monroe Township's policy of always handcuffing prisoners behind the back, without exception, was deliberately indifferent to such prisoners' constitutional rights and violated Plaintiff's right to be free of excessive force. Although the record indicates that Monroe Township Police SOPs provided officers with discretion when choosing to handcuff prisoners, Plaintiff points to the testimony of Chief Christopher to establish the Chief's acquiescence to a policy of always handcuffing individuals behind the back.  Chief Christopher testified that he did not recall any exceptions to handcuffing a prisoner behind the back, but noted "I'm sure there are, and there's always a different circumstance, however, for the safety of everyone, handcuffing from the back is what you're supposed to do."  Pl.'s Ex. K, Christopher Dep. 24:18-25:2.

Plaintiff also relies on his expert, who found

that appropriate and standard and on going in-house training sessions, involving Handcuffing Techniques as a follow up to

24

> the academy training received by all police officers
> graduating the basic course, was not mandated by the Chief
> of Police.  This failure to objectively train and supervise
> police officers under the command and direct responsibility
> of the police chief to administratively enforce standard
> operational policy thereby added causation of the
> violation(s) discussed herein."

Pl.'s Ex. L, Williams Report at 11.

Plaintiff further points to testimony of the Monroe Township Police Training Officer, who testified that Monroe Township did not provide training to officers regarding the use of handcuffs, see Pl.'s Ex. E, Cortesi Dep. 33:14-21, or training as to who would qualify as a "handicapped prisoner," as identified in Monroe Township SOP 38:2.4.  See Id. at 28:12-19.  Officer Cortesi also testified that Monroe Township did not train officers regarding the transport of a person in handcuffs from a prone position to a standing position.  See Id. at 33:22-34:21.

Finally, and importantly, Detective Wolfe testified that "[w]e handcuff everybody behind their back," although he acknowledged that he did not recall receiving training on how to restrain a person who could not put his or her arm behind the back.  Pl.'s Ex. C, Wolfe Dep. 13:2-8; 96:1-5.  Wolfe further testified that he did not know whether Monroe Township had a policy regarding handcuffing.  Id. at 13:9-12.  The record before this Court, however, reveals that such policy did, in fact, exist.  This lack of knowledge, coupled with the testimony of the training officer, is problematic in the face of a failure to

25

train allegation.  Moreover, Wolfe stated that even if he knew that Plaintiff had a shoulder injury that made it difficult or impossible for him to move his arm behind his back, Wolfe was not sure whether he would have made a different decision about how to handcuff Plaintiff.  Id. at 95:15-22.  Clearly Detective Wolfe's knowledge of Monroe Township's SOPs regarding handcuffing could have produced a different result in this case.

Plaintiff has proffered sufficient evidence to establish a factual question regarding whether Monroe Township maintained an unconstitutional policy or practice and whether Monroe Township's failure to provide training on the appropriate use of handcuffs under the Monroe Township SOPs was deliberately indifferent to the risk of constitutional harm.  Indeed, such lack of training "seems comparable to 'a failure to equip law enforcement officers with specific tools to handle recurring situations.'"  Berg, 219 F.3d at 277 (quoting Bryan County, 520 U.S. at 409).  The use of force in requiring a disabled or injured person to place his or her arms behind the back, despite his or her physical incapacity to do so, falls within "the narrow range of circumstances" where a violation of citizens' right to be free from excessive force would be a highly predictable consequence of a failure to train officers to handle such situations.  Similarly, the failure to train officers as to how to transport a handcuffed person from a prone position to a standing position would predictably result in

constitutional violations where, as alleged here, an officer picked up a person by the handcuffs and caused physical injury.

Because the Court is unable to determine that Monroe Township was not deliberately indifferent to these risks as a matter of law, and because it appears, giving Plaintiff the benefit of all reasonable inferences, that Plaintiff can maintain a claim that Monroe Township executed an unconstitutional handcuffing policy and that the Township's failure to train caused Plaintiff's constitutional injury, these issues must be addressed by a jury.  Id. See also Watson v. Abington Twp., 478 F.3d 144, 157 (3d Cir. 2007)("Typically,'[a]s long as the causal link is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury.'")(quoting Bielevicz, 915 F.2d at 851)).

**C.  Punitive Damages Against the Township Pursuant to § 1983**

Defendants correctly note that municipalities are immune from liability for punitive damages under § 1983.  See City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 271 (1981).

**D.  State Law Claims**[6]

---

[6]     Neither party has addressed whether Plaintiff complied with the notice requirements of the New Jersey Tort Claims Act. See N.J.S.A. 59:8-8.  See also Velez v. City of Jersey City, 180 N.J. 284, 294 (2004) (holding that New Jersey Tort Claim notice requirements apply to intentional tort claims as well as negligence claims).  In the absence of any reason to believe that Plaintiff has not complied with the notice requirements, the

As previously noted, Plaintiff withdrew his false arrest and false imprisonment claims.  See Pl.'s Br. at 2.  Plaintiff, however, asserts claims against Detective Wolfe for assault and battery, violation of the New Jersey Civil Rights Act and negligence against both Detective Wolfe and the municipality. Defendants maintain that Detective Wolfe's use of force did not violate New Jersey law and that he is entitled to "good faith immunity" pursuant to N.J.S.A. 59:3-3.[7]

New Jersey protects a public employee from liability where he or she "act[ed] in good faith in the execution or enforcement of any law."  N.J.S.A. 59:3-3.  However, "[t]he same standard of objective reasonableness that applies in Section 1983 actions also governs questions of good faith arising under the Tort Claims Act, N.J.S.A. 59:9-3."  Wildoner v. Borough of Ramsey, 162 N.J. 375, 387 (2000).  Therefore, because fact questions exist regarding Detective Wolfe's use of force, Defendants' motion for summary judgment as to the assault and battery claim must be denied.

---

Court cannot dismiss Plaintiff's tort law claims on this basis.

[7]    The Court notes that the parties provided only limited briefing on Plaintiff's state law claims.  In light of the fact that summary judgment is being denied, the Court need not engage in its own, exhaustive analysis on these issues where the parties have not done so themselves.  If the parties believe the Court has overlooked an issue, their proper recourse is a motion filed pursuant to Local Civil Rule 7.1(i).

Although Defendants did not raise this issue, N.J.S.A. 59:5-2(b)(3) prohibits liability for any injury caused by "a person resisting arrest or evading arrest."  However, as previously noted, granting Plaintiff the benefit of all reasonable inferences, a jury must determine whether Plaintiff was resisting arrest or merely requesting that he not be handcuffed behind the back.  Defendants also did not raise immunity granted pursuant to N.J.S.A. 59:3-2(a), which states that "[a] public employee is not liable for an injury resulting from the exercise of judgment or discretion vested in him."  However, the Tort Claims Act is clear that "[n]othing in this act shall exonerate a public employee from liability if it is established that his conduct was outside the scope of his employment or constituted a crime, actual fraud, actual malice or willful misconduct."  N.J.S.A. 59:3-14.  Therefore, because this Court must grant Plaintiff the benefit of all reasonable inferences, a jury could find that Detective Wolfe acted with actual malice or committed willful misconduct.

With regard to Plaintiff's negligence claim against Defendant Wolfe, New Jersey law is clear that "mere negligence on the part of a public employee is generally not sufficient to defeat the good-faith immunity provided by N.J.S.A. 59:3-3."  Dunlea v. Twp. of Belleville, 349 N.J.Super. 506, 509-510 (App. Div.), certif. denied, 174 N.J. 189 (2002).  Rather, in order to defeat a claim of good-faith immunity, a plaintiff must show that

the defendant acted recklessly.  Id. at 512.  "Recklessness, unlike negligence, requires a conscious choice of a course of action, with knowledge or a reason to know that it will create serious danger to others.  Negligence may consist of an intentional act done with knowledge that it creates a risk of danger to others, but recklessness requires a substantially higher risk."  Id. at 513 (quoting Schick v. Ferolito, 167 N.J. 7, 20 (2001)).  Again, if a jury credits the testimony of Plaintiff and other witnesses at the scene, a question of fact exists as to whether Detective Wolfe acted with reckless disregard for the risk of injury to Plaintiff when by forcing Plaintiff's arm behind his back and pulling him up by the handcuffs.

As for Plaintiff's negligence claim against Monroe Township, the New Jersey Tort Claims Act provides that "[a] public entity is liable for injury proximately caused by an act or omission of a public employee within the scope of his employment in the same manner and to the same extent as a private individual under like circumstances," N.J.S.A. 59:2-2(a).  However, "[a] public entity is not liable for an injury resulting from an act or omission of a public employee where the public employee is not liable."  N.J.S.A. 59:2-2(b).  The liability of Monroe Township therefore depends on whether Detective Wolfe can be held liable for negligence.  See Fielder v. Stonack, 141 N.J. 101, 118 (1995).

Although N.J.S.A. 59:2-10 precludes liability "for the acts of a public employee when those acts constitute a crime, actual fraud, or actual malicious or willful misconduct," a fact question exists as to whether Detective Wolfe acted with actual malice or willful misconduct.  And, as already noted, although N.J.S.A. 59:5-2(b)(3) prohibits liability for any injury caused by "a person resisting arrest or evading arrest," a jury would need to determine whether Plaintiff was, in fact, resisting arrest.

Finally, Plaintiff presents a claim against Detective Wolfe pursuant to the New Jersey Civil Rights Act, N.J.S.A. 10:6-2. The Act provides, in relevant part, that

> Any person who has been deprived of any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States, or any substantive rights, privileges or immunities secured by the Constitution or laws of this State, or whose exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law, may bring a civil action for damages and for injunctive or other appropriate relief.

N.J.S.A. 10:6-2(c).  "Thus, properly read, the statute provides a person may bring a civil action under the Act in two circumstances: (1) when he's deprived of a right, or (2) when his rights are interfered with by threats, intimidation, coercion or force." Felicioni v. Administrative Office of Courts, 404 N.J. Super. 382, 400 (App. Div. 2008).

Because the Court has already determined that triable issues of fact exist with regard to whether Plaintiff was deprived of rights guaranteed him by the Fourth Amendment, summary judgment as to this claim is likewise denied.

**E.  Punitive Damages Under State Law**

Pursuant to N.J.S.A. 2A:15-5.12(a), a plaintiff seeking punitive damages must prove

> by clear and convincing evidence, that the harm suffered was the result of the defendant's acts or omissions, and such acts or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions. This burden of proof may not be satisfied by proof of any degree of negligence including gross negligence.

Id. The statute further requires a trier of fact to consider "(1) [t]he likelihood, at the relevant time, that serious harm would arise from the defendant's conduct; (2) [t]he defendant's awareness of reckless disregard of the likelihood that the serious harm at issue would arise from the defendant's conduct; (3) [t]he conduct of the defendant upon learning that its initial conduct would likely cause harm; and (4)[t]he duration of the conduct or any concealment of it by the defendant."

Again, triable issues of fact exist regarding whether Defendants acted with reckless disregard for Plaintiff's safety. Therefore, the Court will not dismiss Plaintiff's claims for punitive damages under state law at this time.

**V.    Conclusion**

For the aforementioned reasons, Defendants' Motion for Summary Judgment is denied.  Plaintiff's claim for punitive damages pursuant to § 1983 against Monroe Township is dismissed. An appropriate Order will issue this date.


Dated:  February 4, 2010          s/Renée Marie Bumb
                                  RENÉE MARIE BUMB
                                  UNITED STATES DISTRICT JUDGE